IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTINE BAY, | ) |
| Plaintiff, | ) |
| v. | ) No. 16 C 9525 |
| | ) Magistrate Judge Sidney I. Schenkier |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Christine Bay has moved for reversal and/or remand of the Commissioner's decision denying her application for Social Security benefits (doc. # 12: Pl.'s Mot. for Summ. J.). The Commissioner has filed a cross-motion asking the Court to affirm the decision (doc. # 20: Def.'s Mot. for Summ. J.). For the reasons that follow, we grant Ms. Bay's motion to remand.

### I.

Ms. Bay applied for disability insurance benefits in October 2012, alleging disability beginning on August 10, 2011 (R. 167-74, 216). Her date last insured was December 31, 2013. Ms. Bay's application was denied initially and on reconsideration, and the ALJ held a hearing on December 3, 2014 (R. 35-77). In March 2015, the ALJ issued a written decision denying plaintiff's application for benefits (R. 13-34). The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-6). *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017).

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Nancy A. Berryhill as the named defendant.

[2]On February 2, 2017, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 9).

## II.

Ms. Bay worked as a flight attendant from 1998 to 2008, but testified that she stopped working when she could no longer handle the pain from her fibromyalgia, with which she was diagnosed in 1999 (R. 45, 49-50). Between 2010 and 2013, Ms. Bay received primary care treatment from Tina Zofakis, M.D., and Argiro Zofakis, M.D. (*see, e.g.*, R. 309-66). Ms. Bay consistently complained to them of joint and muscle pain, and intermittently complained of fatigue, depression and urinary incontinence (*see, e.g.*, R. 338-66). On examination, her physicians frequently noted localized pain, aches, and tenderness along her joints, including along her back, knee, elbow, and gluteal area (*Id.*). Ms. Bay's doctors prescribed Flexeril (a muscle relaxant) and recommended physical therapy and weight loss (*Id.*). Ms. Bay tried other pain medications, but Flexeril was the only medication that helped "ease[] the excruciating pain," though it made her dizzy, sleepy and nauseous (R. 57-60).

In January 2013, Ms. Bay sought treatment for stress urinary incontinence; she reported that she lost abnormal amounts of urine requiring multiple pads, which impaired her activities of daily living (R. 392). She preferred surgical management to physical therapy or other conservative management, and after further medical testing, a plan was made for her to receive a retropubic sling (R. 390-93).[3]

Ms. Bay began seeing a rheumatologist, Jerry Coltro, M.D., on January 30, 2013. Dr. Coltro noted that Ms. Bay had full range of motion but "[c]lassic trigger points present also nonclassic trigger points tender including scalp," and "[a]ll muscles tender" (R. 413). At a follow up examination on April 8, 2013, Dr. Coltro noted that Ms. Bay's symptoms were "unchanged[,]

---

[3] In a retropubic sling procedure, the surgeon uses strips of synthetic mesh and human tissue to create a sling or "hammock" under the urethra to the bladder neck. https://www.mayoclinic.org/diseases-conditions/urinary-incontinence/in-depth/urinary-incontinence-surgery/art-20046858.

2

still severe muscle trigger point pain[,] chronic fatigue comes and goes" (R. 422-23). Dr. Coltro recommended weight loss and exercise (R. 424).

On February 14, 2013, Liana G. Palacci, D.O., conducted an internal medicine consultative examination for the Bureau of Disability Determination Services (R. 404). She found that Ms. Bay had 18 of 18 tender points, consistent with fibromyalgia, but normal strength and range of motion (R. 405). On March 4, 2013, a state agency physician opined that Ms. Bay had the physical residual functional capacity ("RFC") to perform a full range of light work (R. 116-17).

Dr. Coltro examined Ms. Bay again on March 14, 2014 (R. 425). He opined that Ms. Bay had no apparent neurological deficit, but that "unbearable pain" and fatigue were Ms. Bay's major problems (R. 429). After another examination on November 3, 2014 (R. 441), Dr. Coltro filled out a fibromyalgia RFC questionnaire (R. 435). He indicated that she had daily severe pain throughout her body due to fibromyalgia and anticipated that Ms. Bay's condition would cause her to be absent from work "most of the time" (R. 435-36).

At her hearing on December 3, 2014, Ms. Bay testified that the intensity of her pain has progressively worsened over the years. She had constant aching pain and painful, stabbing spasms that migrated from her neck and upper back in 2011 and 2012, down to her lower back, hips and knees in 2013 (R. 40, 45, 57, 61). She had good days and bad days; she had back spasms almost all the time, but two to three times a month they were so painful they wiped her out for two to three days (R. 52-54). Ms. Bay cared for her personal hygiene most of the time, but if she had an episode or spasm, she needed help bathing (R. 51-52). She was constantly tired because she had trouble sleeping due to pain (R. 51, 62). Ms. Bay went to the bathroom often

3

due to stress incontinence, and she sometimes had accidents and soiled herself (R. 63). The limitations caused by her physical ailments made her depressed (R. 60).

A vocational expert ("VE") also testified at the hearing. The ALJ described a hypothetical individual who could perform light work with non-exertional limitations including "simple, routine, and repetitive tasks, only occasional decision making, only occasional changes in the work setting, and relaxed or flexible production rate requirements. Only occasional interaction with the public, because of stress, and occasional interaction with co-workers with no tandem tasks" (R. 65-66). The ALJ defined tandem tasks as "her work would be dependent upon what someone else does, if someone else's work would be dependent upon what she does" (*Id.*).

The VE stated that "any type of substantial, gainful activity" would be ruled out because jobs in the service and clerical industries require more than occasional contact with co-workers and/or the general public, and in manufacturing jobs with relaxed and flexible production rates, "you are working in a tandem type of a task production. . . . [P]eople can work in conjunction with others in order to complete their work-related tasks" (R. 66-68). The VE explained that an individual working in tandem would have to be constantly around co-workers, but that individual would not necessarily need to "communicate" with co-workers (R. 70). In those manufacturing jobs, employees could take only an extra two to three minute bathroom break in the morning and afternoon; longer breaks would lead to termination (R. 69-72). Ms. Bay testified that some days she might have a couple of accidents that required time to clean up and change clothes, but other days she might have no accidents (R. 72-74).

### III.

In his written opinion, dated March 27, 2015, the ALJ determined that Ms. Bay was not under a disability from her alleged onset date of August 10, 2011 through her date last insured of

4

December 31, 2013 (R. 16). The ALJ found that Ms. Bay had the severe impairments of fibromyalgia, low back pain syndrome, obesity and depression, but that her urinary incontinence was not severe because it was "unclear" if she ever followed through with the surgical procedure or other treatment (R. 18). The ALJ determined that none of Ms. Bay's impairments met a Listing (R. 19).

In addition, the ALJ found that Ms. Bay's mental impairment did not satisfy the Paragraph B criteria (R. 19). The ALJ found that she had moderate restriction in activities of daily living because she sometimes needed help with her personal care and hygiene; mild difficulties in social functioning because she lived with her husband and two kids, occasionally shopped and had friends help her with chores; moderate difficulties in concentration, persistence or pace because her chronic pain affected her concentration but she was alert and oriented in her examinations; and no episodes of decompensation of extended duration (R. 20).

The ALJ stated that Ms. Bay had an RFC to perform light work with "a sit/stand option allowing the claimant to sit or stand alternatively at will" and some additional physical limitations (R. 21). The ALJ assigned Ms. Bay the following non-exertional limitations: "simple, routine and repetitive tasks; employed in a low stress job with occasional decision making required, occasional changes in the work setting and relaxed or flexible production rate requirements; and only occasional interaction with the public due to stress and occasional contact [with] coworkers, but she could perform tandem tasks with coworkers" (*Id.*).

The ALJ found that Ms. Bay's testimony about her condition was not entirely credible, because her daily activities were "not limited to the extent one would expect, given [her] complaints of disabling symptoms and limitations" (R. 22). The ALJ stated that the following activities were inconsistent with Ms. Bay's complaints of disabling symptoms: her symptoms

5

were "intermittent and she had days where she felt fine;" Flexeril helped alleviate her symptoms; she had a good support system of friends and family; Ms. Bay was not in "acute distress" during examinations, despite her complaints of pain; she could hold coins, turn doorknobs, button shirts and tie shoelaces; she did not need a cane to ambulate; and she generally exhibited full range of motion (*Id.*). In addition, the ALJ found that a gap in treatment -- Ms. Bay only sought treatment twice between April 2013 and December 2014 -- suggested her pain was not as debilitating as she alleged (*Id.*). The ALJ stated that Ms. Bay's "fibromyalgia was present at approximately the same level of severity prior to the alleged onset date," but Ms. Bay was able to work as a flight attendant from the time of her fibromyalgia diagnosis in 1999 until 2008, "strongly suggest[ing] that it would not currently prevent work" (*Id.*).

The ALJ reviewed the treatment notes from Dr. Tina Zofakis and Dr. Argiro Zofakis, who noted that Ms. Bay had tenderness, multiple positive trigger points, and fatigue, as well as full range of motion (R. 22-24). The ALJ also noted that Dr. Coltro's and Dr. Palacci's examinations showed Ms. Bay had multiple tender points and trigger points, but full range of motion in her joints and intact muscle strength (R. 24-25). The ALJ described Ms. Bay's physicians as "not[ing] generally normal examinations, but a history of fibromyalgia" (R. 26).

The ALJ gave great weight to the state agency physical RFC assessment opining Ms. Bay could perform a full range of light work, finding it consistent with the medical evidence and Ms. Bay's daily activities (R. 25). However, the ALJ gave limited weight to Dr. Coltro's opinions because "[t]he course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly disabled, as the doctor has reported" (R. 26). Dr. Coltro saw Ms. Bay three times since January 2013, and Ms. Bay "merely received medications and instructions to exercise and lose weight" (*Id.*). The ALJ then speculated that Dr. Coltro may have

6

expressed an opinion "in an effort to assist" Ms. Bay because he "sympathize[d]" with her or to "satisfy" her possibly "insistent and demanding" requests and "avoid unnecessary doctor/patient tension" (*Id.*). Ultimately, the ALJ found that Ms. Bay could not perform her past relevant work as a flight attendant, but that she could work in the manufacturing jobs (packer, assembler and sorter) identified by the VE as low production rate, tandem work positions (R. 27-28).

## IV.

Our review of the ALJ's decision "is deferential; we will not reweigh the evidence or substitute our judgment for that of the ALJ." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). "We will uphold that decision if it is supported by substantial evidence in the record," *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017), which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017). "An ALJ need not address every piece of evidence, but he must establish a logical connection between the evidence and his conclusion," *i.e.*, "build an accurate and logical bridge" between the evidence and his conclusion. *Lanigan*, 865 F.3d at 563.

Ms. Bay alleges that the ALJ committed several errors requiring remand. We agree. In this opinion, we focus on the errors the ALJ made in determining the RFC and in analyzing Ms. Bay's fibromyalgia. We decline to reach Ms. Bay's additional assignments of error.

### A.

There were several errors in the RFC that the ALJ created. *First*, the ALJ's decision to limit Ms. Bay's RFC to relaxed or flexible production rates and only occasional contact with co-workers but allow her to perform tandem work is inconsistent with the VE's testimony. In response to the ALJ's hypothetical of an individual who needed relaxed or flexible production rates, occasional contact with co-workers, and no tandem work, the VE stated that no substantial

gainful employment was available because the jobs with flexible production rates involved tandem work. The VE went on to state that tandem work required constant contact -- though not communication -- with co-workers. The ALJ did not ask the VE -- and the VE did not discuss -- whether an individual could be limited to occasional contact with co-workers and perform tandem work.

Nevertheless, in his opinion, the ALJ assigned an RFC that limited Ms. Bay to occasional contact with co-workers but also allowed her to perform tandem work. The ALJ failed to explain how both can be true in light of the VE's testimony that tandem jobs require constant contact with co-workers. Without any explanation for the evident inconsistency, the ALJ's RFC cannot stand.

*Second*, the ALJ erred in failing to account for any limitations arising out of plaintiff's incontinence. The ALJ determined that plaintiff's incontinence was a non-severe medically determinable impairment, but never determined what impact Ms. Bay's bathroom breaks would have on her ability to maintain full-time employment. Ms. Bay told the ALJ that her bathroom breaks were out of the norm because of the "frequency, the amount of accidents" she has (R. 72). Ms. Bay could not say how many accidents she would have or bathroom breaks she would need in an hour because it was unpredictable; some days she had a couple of accidents, other days she had none (R. 74). The VE testified that if an individual's ability to remain on task fluctuated so that a couple of days a week she was off task an unacceptable amount of time -- for example, because she needed to take extended or additional bathroom breaks -- she would be off task too often to sustain gainful employment (R. 71, 75).

However, the ALJ did not incorporate into the RFC Ms. Bay's testimony that she took an abnormal amount of bathroom breaks. The ALJ noted that it was not clear whether Ms. Bay ever

sought surgery or further treatment for her urinary incontinence. To the extent that the ALJ deemed this to be evidence contradicting her claim of urinary incontinence problems, we conclude that the ALJ was not at liberty to do so without probing the reasons for the lack of surgery or other treatment after Ms. Bay sought treatment in 2013. The ALJ cited no other evidence in the record to contradict Ms. Bay's testimony that she took an abnormal number of bathroom breaks, sometimes for an abnormal length of time. The ALJ's failure to consider how Ms. Bay's bathroom breaks could affect her RFC was error.

**B.**

The ALJ's opinion also demonstrates a fundamental misunderstanding of Ms. Bay's fibromyalgia, which led to errors in the ALJ's assessment of Ms. Bay's treating physicians and Ms. Bay's credibility. The ALJ acknowledged that all of Ms. Bay's physicians found that Ms. Bay had tenderness and multiple positive trigger points, consistent with fibromyalgia. In addition, she consistently complained of severe joint and muscle pain. However, the ALJ found that Ms. Bay's complaints of disabling symptoms from fibromyalgia were not credible because she had days where she felt fine, Flexeril helped alleviate her symptoms, and at medical examinations she generally exhibited full range of motion and strength. In addition, the ALJ found that Dr. Coltro's treatment of Ms. Bay was not consistent with what one would expect if Ms. Bay were truly disabled, because Ms. Bay "merely received medications and instructions to exercise and lose weight" (R. 26).

"The ALJ's analysis reveals that he misunderstood the nature of [Ms. Bay's] fibromyalgia pain." *Gerstner v. Berryhill*, __ F.3d __, 2018 WL 298803, at *5 (7th Cir. Jan. 5, 2018). "The extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment." *Id.* (citing http://www.mayoclinic.org/diseases-

conditions/fibromyalgia/diagnosis-treatment/diagnosis/dxc-20317823). In this case, as in *Gerstner*, trigger-point testing "pinpointed fibromyalgia as the source of [Ms. Bay's] pain." *Gerstner*, 2018 WL 298803, at *5. Ms. Bay's physicians' recommendations to exercise and examination results showing that she had full range of motion and strength are not inconsistent with the trigger point examinations and Ms. Bay's complaints of fibromyalgia pain and associated limitations. *See Id.*, at *5-6. Likewise, the fact that Ms. Bay had some days where she felt fine and Flexeril helped alleviate her pain is not inconsistent with her claim that on other days she suffered severely painful and disabling spasms from her fibromyalgia. *Id.* at *5. In discounting Ms. Bay's credibility and Dr. Coltro's opinion for these reasons, the ALJ erroneously "overstated test results and treatment recommendations." *Id.*

Moreover, "[t]he fact that [Ms. Bay] worked before the onset date doesn't negate the possibility that she became disabled by the onset." *Vanprooyen v. Berryhill*, 864 F.3d 567, 571 (7th Cir. 2017). The ALJ cites no evidentiary support for his statement that Ms. Bay's "fibromyalgia was present at approximately the same level of severity prior to the alleged onset date." To the contrary, Ms. Bay's need to stop working as a flight attendant in 2008 suggests that her pain and limitations from fibromyalgia have worsened over the years.

Because of these errors, substantial evidence does not support the ALJ's decision, and the case must be remanded for reconsideration of his opinion.

## CONCLUSION

For the reasons stated above, we grant Ms. Bay's motion for remand (doc. # 12), and deny the Commissioner's motion to affirm (doc. # 20). We remand this case for further proceedings consistent with this opinion. The case is terminated.[4]

ENTER:

Sidney I. Schenkier
United States Magistrate Judge

Dated: January 29, 2018

---

[4] We reject Ms. Bay's alternative request for a reversal and an outright award of benefits (Pl.'s Mem. at 15). "An award of benefits is appropriate . . . only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). Here, factual issues have not yet been resolved, and we are not prepared to say that Ms. Bay must inevitably be found disabled. We leave that determination to the ALJ on remand.